**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deirdre Meldrum, | No. CV-20-02165-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

Pending before the Court are Defendants' Motion for Partial Summary Judgment (Doc. 196), Motion to Exclude Expert Report and Testimony of Nathaniel Curtis Under Rule 702, Motion to Exclude Expert Report and Testimony of Gloria Borgstahl Under Rules 702 and 403, and Motion to Exclude Expert Report and Testimony of Bradford Taft Under Rule 702 (Docs. 217, 218, and 219, respectively). For the reasons below, the Motion for Partial Summary Judgment (Doc. 196) is granted in part. The Defendants' Motions to Exclude Experts (Docs 217, 218 and 219) are denied as moot.

**BACKGROUND**

In 2006, Arizona State University's (ASU) President, Michael Crow, and ASU's Executive Vice President and Provost, Milton Glick, recruited Plaintiff to serve as Dean of the Ira A. Fulton School of Engineering.  Plaintiff's offer letter set forth the terms of her proposed employment in which she would be employed both "as professor of electrical engineering with tenure and dean of the Ira A Fulton School of Engineering."  Some of the proposed terms of this joint position were contained in the letter, some in "an outline of resources."

In her counteroffer, Plaintiff accepted the terms set forth in the text of the letter itself, and she made a few counterproposals with respect to the "outline of resources."  An agreed-upon version of the Outline was referenced in (and appended to) Plaintiff's formal offer letter.  (*See* Doc. 197-2 at 47.)  On January 30, 2006, Plaintiff accepted "the offer as specified in the letters you sent me January 9 and 27, as well as the outline of resources in the attachment with my changes and signature."  (Doc. 197-1 at 5.)

On September 9, 2009, Plaintiff met with Defendant Crow and asked for a raise and other resources she felt she were due.  The meeting went poorly.  Plaintiff testified that from that point onward she suffered emotional distress caused by Defendants.

In 2010, Plaintiff agreed to step down as Dean in 2011 and accept an administrative Senior Scientist position.  The terms of her Senior Scientist position were separately negotiated although the negotiations were conducted with reference to her Dean's contract.  During the negotiations, Plaintiff explicitly asked which items in the Outline of Resources would remain in force for her as a Senior Scientist.  (Doc. 197-1 at 33-40, Exh. 7.)  She acknowledged in her negotiations with then Provost Elizabeth Capaldi Phillips, that ASU's commitments in "items 1, 2, and 10" would not carry over because "these pertain specifically to the Ira A. Fulton School[] of Engineering."  Plaintiff further noted that "[i]tems 11 and 12 have been completed," but that she understood "[i]tems 3–9, 13–14 would remain in effect, as they are crucial for the continued success of my research in the Center for Ecogenomics (EG) in the Biodesign Institute."  (*Id*. at 36, ASU_000011)

In response, Capaldi promised that Plaintiff's "collaboration with the University of Washington's Neptune project"—apparently outline # 7—would continue to receive funding, but "wonder if these funds could be used to help leverage the Biosignatures initiative in any way you can to better take advantage of this connection." (*Id*.)  Capaldi also promised to "continue support for [Plaintiff's] laboratory as described in items 3 and 4" but noted that this arrangement would be reviewed on a "five-year schedule (so beginning in 2015-2016)." (*Id*.)  Otherwise, according to Capaldi, "[a]ll other commitments" detailed in the Outline were to "remain as agreed to previously." (*Id*. at 36, ASU_000011).  Plaintiff agreed, (*Id.*), and signed the offer letter. (*Id.* at 40, ASU_000015).

The external funding obtained by Plaintiff declined significantly beginning in 2011.  In 2012 Provost Capaldi notified Plaintiff of her funding expectations as part of her annual review under Defendants' policies.  (Doc. 197 at 2, ¶ 6.)  In August 2013, Plaintiff was informed she had to raise $2.5 million in external funding for fiscal year ("FY") 2014.  (*Id*. at 4, ¶¶ 21, 22; Doc. 197-1 at 46, ASU_023690.)  No later than 2014 Plaintiff was made aware of the metric requiring $382 in grant funding per square foot of laboratory office space.  (Doc. 206 at 9-10, ¶34 (citing Doc. 197-1 at 5-11, 35-40; Doc. 206-10 at 61).)

On June 12, 2014, Plaintiff sent a letter to both the Governor and Attorney General.  The letter complained of her treatment, accusing the Defendants of: (1) failing to pay research and other obligations to her, and (2) manipulating that funding and requesting compensation.  The letters also requested that investigations be undertaken regarding Defendants' administration of grant funds and treatment of faculty and their departures from ASU.  A second updated copy of this letter was sent to the State Auditor in early December 2014, and then copied again to the Governor and the new Attorney General in late January 2015.

On March 26, 2015, Plaintiff was informed that her position of Senior Scientist was going to be eliminated, and that ASU's funding of Plaintiff's support personnel operations and space would be re-evaluated based on a review of resources which would take place in July 2015.  Yet, Plaintiff's position as a Senior Scientist was renewed through FY 2016.

In July 2015, the interim provost discussed with Plaintiff the steep decline in the external funding she had obtained.  In that July review, Interim Provost Mark Searle asked Plaintiff to discuss the results of a "review of the appropriateness of the financial and space resources provided to you for your research."  (Doc. 86 at 28.)  After this review, Searle sent Plaintiff a letter stating "ASU's intention to reduce promised funding for research from the amounts set forth in [Plaintiff's] contract of employment and to remove all such funding by June 30, 2017" unless Plaintiff was able to attain certain funding metrics.  (Doc. 86 at 30.)  The letter further informed Plaintiff that her Senior Scientist position would be terminated—apparently at the end of the fiscal year.

On February 29, 2016, Plaintiff filed an action in state court alleging claims for recovery arising from the above allegations.  Plaintiff's appointment as Senior Scientist ended on June 30, 2016.  Thereafter, Plaintiff's lab space was reduced from 5,558 square feet to 2,137 square feet, and her office space reduced from 2,000 square feet to 482 square feet.  At this same time, ASU ceased its annual funding for the Center for Biosignatures Discovery Automation ("CBDA") operations and NEPTUNE support.  Nearly all CBDA personnel resigned as a result.  In February 2018, CBDA was relocated from the Biodesign building.  In April 2019, Plaintiff was removed as a Biodesign Center Director.

The Arizona Court of Appeals dismissed Plaintiff's state court action which was refiled and then removed to this Court.  Pursuant to that order of dismissal, Plaintiff has only maintained actions based on state law that occurred after February 28, 2015.  Plaintiff has maintained federal claims for acts that occurred after March 1, 2014.

## DISCUSSION

### I.     Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th

Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When the nonmoving party "bear[s] the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate."  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

## II.   Analysis

### A.  Contract Claims (Counts I, II, III, V, VI)

In this case, two separate written contracts are at issue.  The first is when Plaintiff accepted the joint position "as Dean of the Ira A. Fulton School of Engineering and Professor of Electrical Engineering with tenure effective January 1, 2007." (Doc. 197-1 at 5, Exh. 2.)  The second contract, entered approximately four years later, was when Plaintiff accepted the position as "Senior Scientist for Arizona State University." (*Id.* at 40, Exh. 7.)  In both cases the negotiations and the final agreement are written.  No separate contract was negotiated for Plaintiff's return to the faculty after her appointment as a Senior Scientist was canceled.  Plaintiff, in her employment, was thereafter bound by Arizona Board of Regents ("ABOR") employment policies, including explicitly the Academic Affairs ("ACD") Manual.  (Doc. 197 at 2, ¶ 3 Exh. 2–5.)  But, she was further entitled to enforce the specification in her original contract that after she stepped down as Dean she would be entitled to a named professorship and an accompanying stipend of $25,000.

### 1.   Breach of Contract (Count I Declaratory Relief; Count II Breach of Contract)

Arizona courts interpret contracts according to their plain language.  *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 199 Ariz. 43, 47, 13 P.3d 785, 789 (Ariz. Ct. App. 2000).  The Court enforces the ordinary meaning of terms.  *Associated Indem. Corp. v. Hartford Cas. Ins. Co.*, 2009 WL 3722999 at *2 (D. Ariz. Nov. 4, 2009).  Where possible, Arizona courts interpreting the language of contracts give effect to every provision.  *Christi's Cabaret of Glendale, LLC v. United Nat'l Ins. Co.,* 562 F. Supp.3d 106, 116 n.1

(D. Ariz. 2021).  Further, they look to "legislative goals, social policy, and the transaction as a whole."  *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397, 187 P.3d 1107, 1110 (Ariz. 2008).

At oral argument both sides acknowledged that the only factual issues remaining in the contract claims pertain to damages.  Upon further questioning on this point at oral argument, however, Plaintiff referred to *Taylor,* apparently *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134 (1993), and *Darner,* apparently *Darner Motor Sales Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 392–93, 682 P.2d 388, 397–98 (1984).  *Taylor*, and at least to some extent, *Darner* both stand for the general rule of Arizona law that extrinsic evidence may be considered when interpreting the intent of contracting parties to an agreement.  But, according to *Taylor,* when the extrinsic evidence offered to interpret the agreement would "contradict[] or var[y] the meaning of the [written] agreement," 175 Ariz. at 153, 854 P.2d at 1139, extrinsic evidence is not considered. *Darner* further applies to standardized agreements and provides that boilerplate provisions of such agreements are applicable except "where the other party has reason to believe that the party manifesting [] assent would not do so if he knew that the writing contained a particular term."  140 Ariz. at 391, 682 P.2d at 396.  In such cases "the term is not part of the agreement."  *Id.* (quoting *Restatement (Second) of Contracts* § 211).  This doctrine is sometimes called the doctrine of reasonable expectations.

Plaintiff does not successfully raise an issue of fact that the agreement here was a standardized one, or that any of the other elements of a reasonable expectations case are met.  The briefing on the motion does, however, highlight one instance of extrinsic evidence that could be used in interpreting the contract as it pertains to what "named professorship" means in the academic world.  Since the point was argued in the briefing, although not explicitly as extrinsic evidence, the Court will apply the rule in *Taylor* to that specific contractual provision.  Otherwise, at oral argument and in her briefing, Plaintiff seems to assert that the writing was clear and "I think the Court probably can make a determination based on the record whether there is a separate breach or not."  Defendants

evidently agreed.

### a. Named Professorship

The accepted terms of the offer letter contain specific written provisions about what will happen should the Plaintiff leave the deanship—"[y]ou will also have a named professorship with a stipend of $25k which will stay with you on conversion."  Defendants have apparently paid the 25,000 dollar yearly stipend that accompanied the named professorship.  But Plaintiff claims that the title of her professorship the "Distinguished Professor of Biosignature Discovery" does not constitute a named professorship.  She offers the deposition testimony of President Crow as extrinsic testimony as to the meaning of the term "named professorship."  "At ASU it can be many things.  You can – it's a, it's a word in front of the word professor . . . It's generally, a, a—it can be a professorship funded by an endowment and named for the giver."  (Doc. 206-2 at 69, Ex. H.)

To the extent that there may be an understanding in academia that a named professorship is a professorship funded by an endowment and named for the giver, there is a question of fact as to whether the Plaintiff was provided with a "named professorship."  To be sure, Plaintiff must establish that she suffered damages by this breach as one of the elements of her claim, but such damages were not necessarily dismissed as a result of the parties' stipulation dismissing any claims for interfering with commercializing inventions or intellectual property, or failing to properly credit Plaintiff as an inventor.  Therefore, Plaintiff maintains such a claim for the time period after February 28, 2015.  Defendants' motion for summary judgment on this aspect of her contract claim is thus denied.

### b. Teaching Obligation Excused (Resource Outline #13)

Pursuant to its plain language, the first contract between the parties applied to the joint appointment of Dean and tenured professor.  Item # 13 in the resource outline making up part of that contract states that: "You will not have required teaching.  We assume that you will want some selective teaching at some later point in your deanship."  That the resource item explicitly refers to her position as Dean indicates that the parties intended it to apply to the term of her joint appointment as the offer letter makes clear that it does.

However, that flexibility as to any teaching obligation was also explicitly incorporated into Plaintiff's contract for her Senior Scientist position. The lack of teaching obligation, therefore, applied throughout her term as Senior Scientist.

Nevertheless, as of mid-2016, Plaintiff was no longer in her Senior Scientist position, and she has no claim that Defendants had contractually excused her from fulfilling teaching assignments. Plaintiff's claim that her contracts for previous positions "communicated nothing to Plaintiff that these resources were limited in duration or could be modified or terminated during her tenure without her agreement or consent" neglects the fact that the outline of resources explicitly applied only to her joint appointment, and was therefore limited by that appointment. Some of those terms were extended to her term as Senior Scientist. The terms of those contracts, however, do not extend beyond her employment in those respective positions, except for her specification in the original contract that when she left the deanship she would retain the named professorship with the associated $25,000 stipend. It is not clear that Plaintiff makes any claim that she was obliged to teach prior to her removal as Senior Scientist on June 30, 2016. To the extent she was not obliged to teach until thereafter, such claims for breach are dismissed.

### c. Reduction in Lab Space (Resource Outline Item #5)

Similarly, when Plaintiff became a Senior Scientist, she renewed the resource from her joint Dean/tenured professor contract that promised her at least 5,000 square feet of lab space. Again, however, when her appointment as Senior Scientist ceased in mid-2016, that contractual obligation on the part of the Defendants ended. It appears to the Court that Plaintiff does not contend that her lab space was reduced prior to her removal from the Senior Scientist position. To the extent that her lab space was not reduced until after she lost her Senior Scientist position such claims for breach are dismissed.

### d. Institutional Funding and Research Personnel (Resources Outline Items # 3 and #4)

In negotiating the applicability of items 3 and 4 (lab funding and research resources) from the deanship resource outline to also apply to her Senior Scientist position, Plaintiff

agreed to Provost Capaldi's specification that this arrangement would be reviewed on a "five-year schedule (so beginning in 2015-2016)." (*Id.*)  Because Plaintiff lost her position as Senior Scientist in 2016, ASU thereafter had no obligation to fund items 3 and 4, regardless of any review criteria period specified in her Senior Scientist contract.  Further, there is nothing in her Senior Scientist contract which would allow her to participate in, or consent to the review criteria.

In her motion papers, Plaintiff acknowledges that she lost neither space nor resources until after July 1, 2016.  The move of the CBDA lab did not occur until 2017 and Plaintiff points to no agreement, express or implied, that her lab space had to be in a particular building or was unmovable.  Her claims for breach based on a lack of institutional funding and research personnel are, thus, dismissed.

### 2.  Breach of Implied Covenant (Count III)

A party cannot use its discretion to prevent the other from receiving the benefits of the contract. *Wells Fargo Bank, N.A. v. Ariz. Laborers, Teamsters & Cement Masons Local NO. 395 Pension Trust Fund*, 201 Ariz. 474, 490, 492, 38 P.3d 12, 28, 30 (Ariz. 2002). Plaintiff asserts that Defendants breached the implied covenant by failing to deliver promised resources, "unilaterally reducing space, poaching staff, poorly planning and executing a move of the CBDA lab that interfered with existing research and has made it impossible to conduct future research and be competitive for future external grants." (Doc. 205 at 20.)  Nevertheless, the mere recitation of this laundry list does not establish issues of fact as to any of Plaintiff's claims for breach. Plaintiff acknowledges that she lost neither space nor resources, nor salary, until after July 1, 2016.  She thus has no contractual claims for breach of contract, nor for breach of the implied covenant of good faith and fair dealing.  *Cf. Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 423, 46 P.3d 431, 434 (Ariz. Ct. App. 2002) (holding that "an implied covenant of good faith and fair dealing cannot directly contradict an express contract term").   Aside from alleged failure of ASU to provide her with a name professorship, and any teaching obligation that was imposed prior to July 1, 2016, no issues identified by Plaintiff remain.

Defendants' partial motion for summary judgment is granted as to Plaintiff's breach of implied covenant claims except as to the claim that she did not receive a named professorship after February 28, 2015, or that a teaching obligation was imposed upon her prior to July 1, 2016.

### 3.  Count V Unjust Enrichment, Count VI Promissory Estoppel

Plaintiff's unjust enrichment and promissory estoppel claims fail as a matter of law because her employment was governed by a written contract.  *See, e.g.*, *Bowman v. Honeywell Int'l, Inc*., 438 Fed. Appx. 613, 615 (9th Cir. 2011) (promissory estoppel); *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (Ariz. 1976) (unjust enrichment); *Chanay v. Chittenden,* 115 Ariz. 32, 35, 563 P.2d 287, 290 (Ariz. 1977) ("There can be no implied contract where there is an express contract between the parties in reference to the same subject matter").  The written contract establishes that no promises made to Plaintiff were breached except as above-specified.

### 4. Misrepresentation Claims (Counts IV and XVI)

Plaintiff alleges that when Defendant Crow recruited her to serve as Dean, he made "explicit promises . . . regarding [Plaintiff's] tenure, title and position, and institutional resources and financial support including dedicated laboratory space." (Doc. 86 at 11; ¶¶ 19–20.) Crow initially made these representations verbally but later formalized them in the 2006 Offer Letter and Outline of Resources. (Doc. 86 at 12; ¶ 20.) Plaintiff also alleges that at Crow's instigation Capaldi made misrepresentations about many of these promised resources during their negotiations about Plaintiff's Senior Scientist position. (Doc. 86 at 14-15; ¶¶ 28–29.)

*Negligent Misrepresentation*.  Importantly, "[u]nder Arizona law, the tort of negligent misrepresentation requires a plaintiff to prove the defendant misrepresented present facts.  A negligent misrepresentation claim cannot be based upon a promise of future conduct." *Bowman v. Honeywell Int'l, Inc.*, 438 F. App'x 613, 615 (9th Cir. 2011) (internal citation omitted).

Plaintiff offers no evidence that Crow or other ASU administrators misrepresented

present facts when they made promises to Plaintiff. Nor does she provide any evidence that Crow or Capaldi provided her with false information when negotiating her employment. She also does not provide any evidence that Crow or Capaldi failed to exercise reasonable care to determine whether ASU had the capacity to provide Plaintiff with the proffered resources. Accordingly, Defendants' partial motion for summary judgment is granted as to Plaintiff's negligent misrepresentation claims.

*Intentional Misrepresentation.* As with negligent representation, statements about future acts cannot be the basis of a fraud or a misrepresentation claim "unless such were made with the present intent not to perform." *Spudnuts, Inc. v. Lane,* 641 P.2d 912, 914 (Ariz. Ct. App. 1982). Plaintiff has simply failed to demonstrate that Crow, made statements with the present intent not to perform them. As such Plaintiff has provided no basis for either a fraud, or a negligent misrepresentation claim, against any of the Defendants here. *Cf. McAlister v. Citibank (Ariz.)*, 171 Ariz. 207, 214, 829 P.2d 1253, 1260 (Ariz. Ct. App. 1992). Counts IV and XVI are, therefore, dismissed.

## 5. Tortious Interference Claim (Count VIII)

Because a party cannot interfere with its own contracts, neither can a party's employee(s) acting on that party's behalf. *See, e.g.*, *Barrow v. Ariz. Bd. Of Regents*, 158 Ariz. 71, 78, 761 P.2d 145, 152 (Ariz. Ct. App. 1988) (holding that employees acting on behalf of a university in its contract relations cannot interfere with the university's contract because they are acting on behalf of the university and a party cannot interfere with its own contracts); *Lindsey v. Dempsey*, 153 Ariz. 230, 233, 735 P.2d 840, 843 (Ariz. Ct. App. 1987) (holding that university employees cannot interfere with a coach's contract with the university, because those employees were acting on behalf of the university); *Bright LLC v. Best W. Int'l Inc.,* 2018 WL 4042122 at *5 (D. Ariz. July 27, 2018) (holding that "employees acting on behalf of a company cannot interfere with that company's contract"). Plaintiff presents no evidence that the Defendants to these claims were acting other than in their capacities as university employees when they negotiated with her. And she does acknowledge that it is with them that she arrived at the agreement she made with the

university.   Yet, she argues that they were not acting on behalf of the university for purposes of precluding an interference claim because "[d]efendants were not employed for the purpose of making false promises, materially breaching contracts of employment, interfering with scientific research or otherwise breaching the implied covenant of good faith and fair dealing."   (Doc. 205 at 22.)   This logic is unpersuasive and, in any event, relies on allegations of breach or other misconduct which Plaintiff does not sustain with triable issues of fact.   Thus, Plaintiff's tortious interference claims against all Defendants are dismissed.

### B.  First Amendment Claims (Counts X and XI)

In June 2014, Plaintiff's attorney sent a detailed letter to the Governor and the Attorney General.   She thereafter sent the updated letter to the State Auditor and then again sent the updated letter to the Governor and newly elected Attorney General in January 2015.   The Letter contained a detailed recitation of Plaintiff's complaints against the Defendants.   The Letter was over 70 pages long and also included exhibits, contained her employment complaints dating from 2007, the early days of Plaintiff's arrival at ASU, up to the date of the letter.   The letter also included a number of verbatim communications between Plaintiff and Defendants about her dealings with the administration, including the administration's budgeting of university and grant resources, promises of funding, her removal as Dean, lost personal opportunities, ASU's failure to acknowledge her judgment on personnel decisions, ASU's misappropriation of her intellectual property, alleged retaliation for her complaints about ASU's failure to fund her research and programs, etc.

The Letter demands that Plaintiff's complaints be investigated by those who are disinterested.   She further demands that she be made whole by the funding of her past unpaid research projects, the future funding of such projects, no ability to move or transfer funds that should be allocated to her or her projects, removal of any and all adverse personnel actions as it pertains to her, making her whole for the injury to her reputation in the scientific community, the implementation of steps necessary for her to receive the benefits she would have received had she been paid and her projects appropriately funded,

1    the imposition of discipline against identified administrators who have mistreated her, and
2    the implementation of appropriate accounting standards.

3            Although all of Plaintiff's whistleblower allegations pertain to her own alleged
4    mistreatment, she does make a generalized assertion. She "believes" that a thorough
5    investigation of her complaints "will expose serious financial and other administrative
6    irregularities with regard to allocation and distribution of public and private funds within"
7    her programs that not only negatively impacted the engineering school over which she was
8    Dean, and the Biodesign Institute of which she was a Director, "but also had an adverse
9    impact on hundreds of students, colleagues and related research activities. In addition, the
10   investigation will likely reveal further instances of 'gross waste,' 'mismanagement,'
11   'misappropriation of public funds,' 'violations of law' and 'abuse of authority' as those
12   terms are defined by the Board of Regents policies." She also includes as attachment A, a
13   list of over 150 former ASU professors who she asserts without any elucidation may have
14   been abused as she has.

15           "Whether speech is on a matter of public concern is a question of law." *Greisen v.*
16   *Hanken*, 925 F.3d 1097, 1109 (9th Cir. 2019). "Whether an employee's speech addresses
17   a matter of public concern must be determined by the content, form, and context of a given
18   statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48
19   (1983). Although the Court declined to dismiss this claim in Defendants' Motion to
20   Dismiss, it noted that, in that Motion, the ASU Defendants did "not address the form and
21   context of these statements. As the Letter touches on matters of public concern, and the
22   ASU Defendants do not present arguments on the remainder of the public concern test, it
23   is not appropriate to dismiss Plaintiff's First Amendment claims at this stage." (Doc. 29 at
24   16.) In their Motion for Summary Judgment, however, the parties have had the chance to
25   develop the record as to the form and context of the statements made.

26           Placed in context, the letters are not matters of public concern. "An employee's
27   motivation . . . [is] relevant to the public-concern inquiry." *Gilbrook v. City of Westminster*,
28   177 F.3d 839, 866 (9th Cir. 1999). Thus, in the Ninth Circuit, whether speech is made on

a matter of public concern is determined by using a two-step analysis: First, "why did the employee speak (as best as we can tell)?  Does the speech 'seek to bring to light actual or potential wrongdoing or breach of public trust' or is it animated instead by 'dissatisfaction' with one's employment situation?"  *Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting *Desrochers v. City of San Bernardino*, 572 F.3d 703, 715 (9th Cir. 2009).

In making this determination, the Ninth Circuit has demonstrated that even a complaint that "ostensibly could invoke a matter of public concern," is not protected by the First Amendment if the employee's "voiced complaint was focused on and driven by his internal grievance."  *Turner*, 788 F.3d at 1208, 1211 (finding that although San Francisco Charter prohibited the use of temporary exempt employees, the claim of a former temporary exempt employee that he was fired because he was exercising First Amendment rights by complaining of his temporary status were in fact driven by grievances about his own employment situation and were thus, not, matters of public concern).

In determining whether speech rises to the level of public concern, "we examine the context of the speech, particularly the *point* of the speech."  *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401, 1405 (9th Cir. 1988.)  "The question of whether the speech was made to 'further some purely private interest' is relevant to that inquiry as is a determination of whether the speech was made in the context of a workplace 'power struggle.'"  *DesRochers,* 572 F.3d at 715 (quoting *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991) then quoting *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996)) (holding that police officers' complaint about their supervisor had some support in the record as arising from a matter of public concern but was primarily motived by dissatisfaction with the work environment and thus were not matters of public concern).

In this case a review of the letters themselves, sent on Plaintiff's behalf by her attorney, demonstrate quite plainly what Plaintiff's point is in sending them.  In her communications she seeks: (a) fifteen million dollars for use in her academic projects and

scientific research; (b) personal oversight of her funding and the implementation of improved accounting methods; (c) proper placement of recurring funds into her research accounts beginning July 1 (d) no transferring of funds between accounts once budgets have been approved; (d) reversal of any and all adverse personnel actions taken against her; (e) imposition of discipline on the ASU President, Provost, Senior VP of Knowledge Enterprise Development, the CEO of ASU Foundation; ASUs CASI Chief Scientist; ASU's Executive VP Treasurer and VP of Human Resources; the CEO of Arizona Technology Enterprises, the COO of Biodesign and the Biodesign Director of Research operations for their treatment of her, (f) no less than 10 million dollars to make Dr. Meldrum whole for the injury to her reputation in all scientific and educational communities, (g) restoration to Dr. Meldrum of $2,000,000   for the Biosignatures Initiative; (h) allow Dr. Meldrum to take her lab and everything in it to another institution and to transfer her grants.

To be sure Plaintiff also asks for the investigation into the damaged reputation of the over 150 professors that are included in attachment A to her letter and further requests a general inquiry into the administration of grant financial administration.  But in doing so, she cannot be said to be a representative of these 150 professors.  Her complaints are not as to them their circumstances or any specific wrongdoing they suffered or any identified policy from which they all suffered.  Rather she generally suggests that they may have been victim to the same conduct for which she raises her own complaints.  But her complaints are for numerous transactions and wrongs that she alleges occurred between her and the Defendants for the seven previous years of her employment for which she seeks remuneration or retribution.  She offers no significant evidence or specific allegations as to how others may have been affected.  The point of her complaints is not masked.  The purpose is for the professor to recover for her own grievances and to prevail in a workplace dispute with the administration about the conditions of her employment.  That the speech contains passing references to matters of public concern incidental to the message conveyed, does not make it a matter of public concern. *Robinson v. York*, 566 F.3d 817,

823 (9th Cir. 2009).

The analysis for any claim based on redress of grievances as opposed to freedom of speech is similarly a claim based in the First Amendment and does not give rise to a different result here.  A state employee cannot claim retaliation for seeking to redress grievances or for free speech when the reason behind her complaint is her own grievances about her own employment.  "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (quoting *Connick*, 461 U.S. at 154).  "To transform every workplace squabble into the proverbial 'federal case' would be to trivialize the 'great principles of free expression' the First Amendment embodies." *Desrochers*, 572 F.3d at 719 (quoting *Connick*, 461 U.S. at 154).  That is true even when complaints are set forth in great length, and raise every possible wrong that Plaintiff may have suffered together with unfounded speculation as to how others may have similarly suffered. Moreover, Plaintiff was required, as a condition of her employment to "report activities or significant incidents that appear to be a misuse of university assets."  Academic Affairs Manual ACD 123.  In cases in which a plaintiff's speech owes its existence to the plaintiff's position, then the employee "spoke as a public employee, and the inquiry is at an end." *Wabbaken v. Cal. Dep't of Corr. & Rehab.*, 2016 WL 8943297 at \*9 (C.D. Cal. June 20, 2016). Counts X and XI of Plaintiff's Amended Complaint are, therefore, dismissed.

### C.      Title VII, IX Claims (Counts XII, XIV and XV)

Plaintiff asserts claims for disparate treatment/intentional sex discrimination under Title VII (Count XIV) and Title IX (Count XII), and a retaliation claim under Title VII.[1]

#### 1.  Disparate Treatment Claims

Even granted that the discrimination claims have separate accrual dates under the statute of limitations, federal courts treat Title VII and Title IX discrimination claims identically in terms of the law that applies.  For example, both Plaintiff's Title VII and Title

---

[1] The parties do not contest that Plaintiff has preserved Title IX claims for discrimination back until February 28, 2014, and back until June 28, 2016, on her Title VII discrimination claim.  (Doc. 205 at 8.)

1    IX claims are subject to the *McDonnell Douglas* burden shifting framework. *Campbell v.*
2    *Haw. Dep't of Educ.,* 892 F.3d 1005, 1023 (9th Cir. 2018) (holding that "[f]ederal courts
3    generally evaluate employment discrimination claims brought under both statutes [Title
4    VII and Title IX] identically").

5        Under that *McDonnell Douglas* framework, when, as here, the plaintiff relies on
6    circumstantial evidence of discrimination, the plaintiff must present "specific and
7    substantial" circumstantial evidence "to defeat the employer's motion for summary
8    judgment." *Coghlan v. American Seafoods Co., LLC.*, 413 F.3d 1090,1095 (9th Cir. 2005)
9    (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)). Plaintiff
10   must not only provide substantial and specific evidence to establish the discrimination, she
11   must also provide substantial and specific evidence to demonstrate that the employer's
12   proffered reason for the adverse employment action(s) was pretextual. *See, e.g.*,
13   *Villiarimo*, 281 F.3d at 1062; *Lewis v. Smith,* 255 F. Supp. 2d 1054, 1059 (D. Ariz. 2003)
14   (holding that "where plaintiff relies on indirect evidence to show that the defendant's stated
15   motive is not the actual motive, [s]uch evidence must be 'specific' and 'substantial' . . . to
16   create a triable issue with respect to whether the employer intended to discriminate on the
17   basis of sex" (quoting *Godwin*, 150 F.3d at 1222)); *see also Manatt v. Bank of Am., N.A.,*
18   339 F.3d 792, 803 (9th Cir. 2003). "[A] plaintiff must identify specific inconsistencies,
19   contradictions, implausibilities, or weaknesses in the employer's explanation so that a
20   reasonable factfinder could infer that the employer did not act for the asserted reason."
21   *Hernandez v. Arizona,* 702 F. Supp. 2d 1119, 1130 (D. Ariz. 2010).

22       That burden is even more pronounced when the defendant meets the "same actor
23   inference": as they do here. *Coghlan*, 413 F.3d. at 1096. The same actor inference does
24   not merely apply when the same actor both hires and fires the plaintiff, it also applies when
25   "the plaintiff was not actually fired but merely offered a less desirable job assignment." *Id.*
26   Moreover, the same actor inference also applies to the final step of the *McDonnell*
27   *Douglass* framework: "[T]he point of the same-actor inference is that the evidence *rarely*
28   is 'sufficient [] to find that the employer's asserted justification is false' when the actor

who allegedly discriminated against the plaintiff had previously shown a willingness to treat the plaintiff favorably." *Id.* at 1097 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

The adverse employment action identified by Plaintiff in her disparate treatment claim, or "[t]he only material difference" between she and her proposed male comparator is he did not: have "his laboratory space unilaterally reduced over his objection . . . [he was not] assigned lab space in a building unsuitable for his research, or removed as a Center Director for failing to meet square foot metrics or deciding not to attend or participate in BDI meetings and events." (Doc. 205 at 10.)[2]

Yet, Plaintiff does not contest the existence of the conditions proffered by Defendants as the reason for their actions in reducing her resources or terminating her directorship. Plaintiff, for example, does not contest that the amount of her external grants declined substantially beginning in 2013, nor does she offer any evidence that the amount of external grant funding she obtained rebounded prior to her resource reduction. She does not assert that she met the square foot metric established by the Defendants for resource allocation in the Biodesign building when her space was removed, nor does she deny that she did not attend the meetings or the retreats of the Biodesign Institute prior to her removal as a director of that institute.

Instead, Plaintiff asserts that she was successful in obtaining external grant funding prior to 2013, (Doc 206 at 9), and that "Plaintiff was not alone in seeing a decrease in her external grant awards." (Doc. 205 at 10.) She further asserts that "[m]ale BDI Directors, including Professor Sid Hecht, received more favorable treatment than Plaintiff despite a decline in the same funding metric purportedly applied to Plaintiff." (Doc. 205 at 10.) But in making this allegation, Plaintiff provides neither specific nor substantial evidence to sustain it. Plaintiff merely cites to her Controverting Statement of Fact at paragraph 37. While the supporting sources in this paragraph that are admissible do identify male researchers, if anything, they demonstrate that the male researchers either met the metrics

---

[2] In her briefing, Plaintiff does not allege that her removal from her Senior Scientist position was an adverse action nor does she identify a comparator for it.

1  that the Plaintiff did not meet, that they voluntarily gave up space, that they did not seek

2  space in the Biodesign building precisely because it was considered more desirable and

3  thus had a higher metric than other buildings, or that they were in different circumstances

4  than Plaintiff.  None of the citations demonstrate either substantially or specifically that the

5  reasons given by Defendants for reducing Plaintiff's resources is pretext.  Thus, Plaintiff's

6  disparate treatment claims under both titles VII and IX are dismissed.

7         **2. Retaliation Claim (Count XV)**

8         Plaintiff claims that after she filed her discrimination charge with the EEOC on

9  April 24, 2017, she suffered retaliation for that action because "Plaintiff was subjected to

10  additional and ongoing adverse employment actions after April 24, 2017."  (Doc. 205 at

11  11.)  She does not, however, identify what such ongoing adverse employment actions were.

12  As with the discrimination claims, retaliation claims are subject to the requirement that,

13  where there is no direct evidence establishing that the adverse actions resulted from

14  retaliation, a plaintiff must establish by substantial and specific circumstantial evidence the

15  existence of the retaliation.  And, further, substantial and specific evidence must

16  demonstrate that Plaintiff's proffered reason for the adverse action is merely pretext for

17  retaliation.  Plaintiff has met neither of these prerequisites.

18        Plaintiff identifies no specific adverse action that occurred after April 24, 2017, in

19  her briefing on retaliation.  Apparently ten months later, in February 2018, CBDA was

20  relocated from the Biodesign building, and two years later, in April 2019, Plaintiff was

21  removed as a Biodesign Center Director.  Contrary to Plaintiff's argument, these adverse

22  actions are not so temporally proximate to April 2017 as to give rise to an inference of

23  pretext, and even if they were, they only constitute what Plaintiff claims is an ongoing

24  pattern of mistreatment against her dating from 2009.  "Where timing is the only basis for

25  a claim of retaliation, and gradual adverse job actions began well before the plaintiff had

26  ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*

27  *v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  Thus, there is no

28  substantial and specific circumstantial evidence of retaliation.

1     Further there is no substantial and specific circumstantial evidence demonstrating

2     that the Defendants' proffered reasons for the loss of lab space and the loss of the

3     Directorship is pretext.  As has been demonstrated above with respect to the Defendants'

4     disparate treatment claim, Plaintiff offers no substantial and specific circumstantial

5     evidence that would support a finding that Defendants' proffered reasons for taking

6     Plaintiff's lab space and removing her from the Directorship is pretext.

7          **D. Damages Claims and Expert Witnesses**

8          Counts II and III remain only as they relate to the named professorship claim and

9     any teaching obligation that may have preceded July 2016.  That part of Count XIII that

10    was not dismissed by Doc. 29 also is not dismissed.  But all other counts of the Amended

11    Complaint were either previously dismissed, or are dismissed by this order.

12         The only remaining claims then, aside from the statutory damage for failure to

13    comply with the public records law, are those for breach of contract.  In breach of contract

14    cases in Arizona an "employee is not permitted recovery for injury to [her] reputation," nor

15    is she permitted to recover for loss of "future earning power or capacity." *Lindsey v. Univ.*

16    *of Ariz.*, 157 Ariz. 48, 54, 754 P.2d 1152, 1158 (Ariz. Ct. App. 1987).  That is because "the

17    computation of damages is too speculative and the damage cannot reasonably be presumed

18    to be within the contemplation of the parties when they entered into the contract." *Id.*; *see*

19    *also Reyes v. Revlon Consumer Prods. Corp.,* 2013 WL 12250530, *4 (D. Ariz. Mar. 28,

20    2013); *Felder v. Physiotherapy Associates,* 215 Ariz. 154, 164, 158 P.3d 877, 887 (Ariz.

21    Ct. App. 2007) (noting that in contrast to a personal injury case, damages for lost earning

22    power are not cognizable in contract).  Because the only remaining claims seek recovery

23    in contract, no claims for loss of earning power or capacity or for loss of reputation are

24    recoverable or relevant.  Therefore, the proposed expert testimony pertaining to such topics

25    is moot, as are the motions to disallow such expert testimony.

26         Accordingly,

27         **IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary

28    Judgement (Doc. 196) is granted in part.  The only counts remaining in this case are the

specific claims brought under Counts II and III as described above, and that part of Count XIII that was not previously dismissed.

**IT IS FURTHER ORDERED** that the Motion to Exclude Expert Report and Testimony of Nathaniel Curtis Under Rule 702, Motion to Exclude Expert Report and Testimony of Gloria Borgstahl Under Rules 702 and 403, and Motion to Exclude Expert Report and Testimony of Bradford Taft Under Rule 702 (Docs. 217, 218, and 219, respectively) are denied as moot.

Dated this 23rd day of January, 2024.

G. Murray Snow
Chief United States District Judge